UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Nicole L. L'Etoile</u>

     v.                    Civil No. 06-cv-00390-JL
                               Opinion No. 2008 DNH 163

<u>New England Finish</u>
<u>Systems, Inc.</u>

**O R D E R**

    The defendant, New England Finish Systems, Inc. ("New England Finish") moves for summary judgment on claims by its former employee, Nicole L. L'Etoile, alleging sex discrimination, including a hostile work environment, and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1), 2000-e-3(a).[1]  New England Finish has also moved to strike a number of the statements relied on in L'Etoile's objection to its summary judgment motion.  This court has jurisdiction under 28 U.S.C. § 1331 (federal question).  For the foregoing reasons, New England Finish's motion for summary judgment is granted in part and denied in part, and its motion to strike is denied as moot.

---

    [1]  L'Etoile advised the court that she is voluntarily dismissing her claims under N.H. Rev. Stat. Ann. § 354-A:7, I, V.

I.   **Applicable Legal Standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). The following background facts are set forth in accordance with this standard. In determining those facts, however, the court has not relied on any of the evidence challenged by New England Finish's motion to strike, making that motion moot.[2]  See Evans v. Taco Bell Corp., 2005 DNH 132, 10 (denying motion to strike as moot where challenged evidence was treated as irrelevant to summary judgment motion).

---

[2]  The court notes that New England Finish has filed motions in limine seeking to exclude the same evidence at trial. Those motions will be ruled on in the ordinary course.

## II.  **Background**

L'Etoile, a member of the Painters and Allied Trades
District Council #35, was hired by New England Finish, a
construction company, in January 2002, through a telephone call
to one of its field supervisors, Raymond Houle.  Houle told
L'Etoile, who had been working as a drywall finisher since 1984,
that he would call her whenever New England Finish had a job
where it needed a woman, such as its upcoming job installing
drywall in a luxury condominium project in Boston, The Belvedere.
Houle later testified that, on construction projects done as part
of the "Boston Plan," the city requested that a certain
percentage of workers be women.  Houle also acknowledged that,
consistent with what he told L'Etoile when he hired her, this
requirement affected the majority of the jobs to which she was
assigned while working for New England Finish.

Starting with the Belvedere job, L'Etoile worked as a
drywall taper for New England Finish during six separate periods
between January 14, 2002 and April 14, 2004.  At the end of each
of these periods--except for the last--the parties agree that
L'Etoile was laid off as a particular job wound down and the
company's need for tapers correspondingly decreased.  L'Etoile
claims, however, that the company chose to lay her off, rather

than similarly skilled male workers, due to her gender.[3]  In fact, L'Etoile testified, during her regular calls to Houle to inquire about available work during her periods of layoff, Houle said that he would re-hire her as soon as New England Finish got a job that required a woman, like the Belvedere job had.

New England Finish, on the other hand, says that it laid off L'Etoile instead of other tapers "because she was not as productive as other workers, was not as flexible as to the work she would do and was generally a more difficult employee to manage."  In particular, New England Finish claims that L'Etoile worked more slowly than the other tapers, stopped working earlier in the day than they did, smoked on job sites where it was prohibited, and expressed reluctance to do sanding work, especially on ceilings, as well as to work in high places or carry her taping compound up flights of stairs.  L'Etoile, in turn, hotly disputes New England Finish's assertions, which are based largely on the testimony of Andre Pomerleau, the foreman who supervised L'Etoile on several of her jobs for the company.

---

[3]  L'Etoile bases this argument largely on Houle's testimony that, from April 5, 2002 to January 31, 2003, he considered her a "core worker," i.e., an employee to whom he had a responsibility to keep on the job; as a result, a core worker ended up working an average of forty-eight weeks each year.  L'Etoile points out that, over the span of her employment with New England Finish, she worked much less frequently than that.

L'Etoile denies that her performance suffered from any of the claimed deficiencies,[4] and states that she was never criticized for any of them by her supervisors--with the exception of a complaint by Pomerleau, during her last job for New England Finish, that she had packed up early on one occasion, which L'Etoile disputes in any event.

L'Etoile also recounts a series of sexist comments by Pomerleau and her other supervisors at New England Finish, starting with statements since her hiring by Pomerleau and her other foreman on jobs for the company, Roger Hallee, that they did not want women there.  Specifically, L'Etoile testified to occasions when she overheard Hallee say, to other workers, "I don't like women on my job," and--in reference to L'Etoile herself--"See, fucking women on the job.  They don't want to do what we tell them to do."  L'Etoile also testified to an incident where she heard Hallee say, in response to seeing her talking with a male co-worker, "Him and his fuckin' women's lib."

According to L'Etoile, her other foreman, Pomerleau, often used a French-language expression which translates to "Les Christ

---

[4]  L'Etoile acknowledged that she did not want to work in high places, but only when she had to work there alone, which she considered a safety risk.

des femmes!"--French for "Goddamned women!"--in her presence,[5]
proceeding to list a number of tasks attendant to drywall
installation that women did not want to do.  This happened as
recently as April 2004, while L'Etoile was working on what turned
out to be her last job for New England Finish.  L'Etoile further
testified that Pomerleau said, while she was working on the
Belvedere job, that she would be "the first one out" when layoffs
began "because we only have to keep one woman here."[6]  L'Etoile
testified that hearing such comments--which Pomerleau has denied
making--caused her to feel "like a little piece of trash"
compared to her male co-workers.

In late March 2004, while working on a job with Pomerleau,
L'Etoile confronted him with a copy of the Technical Assistance
Guide for Federal Construction Contractors, a publication by the
Office of Federal Contract Compliance of the Department of Labor
to assist employers in following nondiscrimination and
affirmative action laws in their dealings with the federal

---

[5]  It appears to be undisputed that L'Etoile understands
French, and that she understood what the phrase meant.

[6]  Pomerleau's wife, Cecile, also worked as a taper for New
England Finish; she was the only other woman who ever worked with
L'Etoile on any of the company's jobs.

government.[7]  In the days prior to the confrontation, L'Etoile
had argued with Pomerleau when he claimed New England Finish
needed to have women only on certain jobs; she used the <u>Technical
Assistance Guide</u> in an attempt to prove her point that the
company was required to hire women on all jobs.  Though Pomerleau
did not read the guide at that point, his wife did, telling him,
"It's there in black and white . . . you have to have women on
all job[s] as an equal opportunity."  Pomerleau considered the
guide "a joke," and did not read it himself.

This was the first time L'Etoile had complained about the
treatment of women at New England Finish.  Soon after, Pomerleau
complained to Houle--also for the first time--about L'Etoile's
performance on the job, during a discussion of which tapers to
lay off as the work on the current project petered out.  In fact,
until that point, Houle had never heard complaints about L'Etoile
from anyone, though he claims to have personally noticed her
smoking on the job once, and that she did not work as efficiently
as the other tapers.  Houle testified that, based on these
observations and Pomerleau's complaint--which included the
charges that L'Etoile did not want to sand or carry her compound

_____

[7]  During a visit to the agency's field office, L'Etoile had
learned, among other things, that she was entitled to the same
employment opportunities as men.

7

up stairs--the men agreed that she should be the next taper laid off.  There is no evidence, however, that Pomerleau told Houle during this discussion about having been confronted with the Technical Assistance Guide by L'Etoile.[8]

L'Etoile was indeed laid off, on April 14, 2006, in an action that New England Finish has admitted was a "termination" in its answer filed in this action.  Houle testified that New England Finish has not attempted to re-hire L'Etoile for essentially the same reasons he gave for laying her off; he further testified that the company's generalized slowdown in the years since has also played a factor, but acknowledged that other tapers have been hired during that time.  New England Finish has stated in its answer, however, that L'Etoile's union sent the company a letter directing it to terminate her for failing to attend mandatory safety training--a rationale that Pomerleau and Houle have since explained had nothing to do with their actions, since, among other reasons, they had already terminated L'Etoile by the time the letter was received.

On July 16, 2004, L'Etoile filed a charge of discrimination against New England Finish with the New Hampshire Human Rights

---

[8]   In support of her contrary position, L'Etoile points to pages from Houle's deposition transcript, but they do not support that view, even when read in the light most favorable to her.

8

Commission, alleging, <u>inter alia</u>, the sex discrimination, hostile environment, and retaliation claims alleged in this action. After the Equal Employment Opportunity Commission, in reliance on its state counterpart's finding of no probable cause for L'Etoile's claims, issued her a notice of her right to sue, she commenced this action.

## III. <u>Analysis</u>

New England Finish moves for summary judgment on each of L'Etoile's claims, arguing that (A) insofar as they rely on acts that occurred more than 300 days prior to when L'Etoile filed her charge of discrimination with the Human Rights Commission, they are barred by the applicable statute of limitations, (B) L'Etoile cannot show a hostile environment claim as a matter of law, and (C)-(D) L'Etoile cannot make out a prima facie case of discrimination in any of her layoffs, or retaliation in her ultimate termination but, even if she can, she cannot rebut New England Finish's legitimate, nondiscriminatory reasons for those actions.  The court will consider these arguments in turn.

### A.   <u>Whether Certain of L'Etoile's Claims Are Time-Barred</u>

An employee must file a charge of discrimination under Title VII "within three hundred days after the alleged unlawful

9

practice occurred."[9]  42 U.S.C. 2000e-5(e)(1).  For purposes of
this rule, "[e]ach discriminatory act starts a new clock for
filing charges alleging that act.  The charge, therefore, must be
filed within the . . . 300-day period after the discrete
discriminatory act occurred."  Nat'l R.R. Passenger Corp. v.
Morgan, 536 U.S. 101, 114 (2002).  It is undisputed that a number
of the "discrete discriminatory acts" encompassed by L'Etoile's
discrimination claim, i.e., her layoffs on March 4, 2002, June
24, 2002, January 1, 2003, and August 15, 2003--occurred more
than 300 days before she filed her charge of discrimination on
July 16, 2004.  L'Etoile's claim that each of those layoffs was
illegally motivated by her gender is time-barred.  See Hargett v.
Valley Fed. Savings Bank, 60 F.3d 754, 763-64 (11th Cir. 1995)
(ruling that lay-off started running of Title VII limitations
period, despite subsequent alleged discriminatory act); London v.
Coopers & Lybrand, 644 F.2d 811, 816 (9th Cir. 1980) (describing
layoff as an example of a discrete act that starts the
limitations clock).  L'Etoile offers no argument to the contrary.

What L'Etoile does argue is that her hostile environment
claim is not time-barred because, while it relies on acts by her

---

[9]  This is the limitations period for a plaintiff who, like
L'Etoile, initially files the charge with a state or local agency
empowered to grant relief from the alleged unlawful practice.
See 42 U.S.C. § 2000e-5(1).

supervisors outside of the limitations period, it also relies on acts within that period, viz., Pomerleau's cursing about women's subpar abilities as drywall installers in April 2004.  "Provided that an act contributing to the [hostile environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability."  Morgan, 536 U.S. at 117.  L'Etoile is therefore correct that New England Finish's statute of limitations defense has no effect on her hostile environment claim.[10]  New England Finish's motion for summary judgment on limitations grounds is granted as to L'Etoile's claim of discrimination in the layoffs that occurred on August 15, 2003, and earlier, but is otherwise denied.

### B.   L'Etoile's Hostile Environment Claim

Title VII prohibits sex based-discrimination in the form of workplace harassment "sufficiently severe or pervasive to alter the terms and conditions of [the victim's] employment and create

---

[10]   L'Etoile also suggests that she may use evidence of her supervisors' sexist comments, even though they occurred outside the limitations period, in support of her retaliation claim. That is an evidentiary issue that is not properly before the court in the context of the summary judgment motion, so the court expresses no view on the admissibility of any of those statements at this point.  See note 1, supra.

an abusive working environment." <u>Meritor Sav. Bank v. Vinson</u>,
477 U.S. 57, 67 (1986) (internal quotation marks omitted).  To
violate Title VII, such an "environment must be both objectively
and subjectively offensive, one that a reasonable person would
find hostile or abusive, and one that the victim did in fact
perceive to be so." <u>Faragher v. City of Boca Raton</u>, 524 U.S.
775, 787 (1998).  Here, the defendants do not dispute, for
purposes of their summary judgment motion, that L'Etoile
subjectively perceived the environment on the New England Finish
jobs as offensive, only that no reasonable person could
objectively see it that way because the complained-of behavior
was not "sufficiently severe or pervasive."  The court disagrees.

"The objectivity severity of harassment should be judged
from the perspective of a reasonable person in the plaintiff's
position, considering all the circumstances." <u>Oncale v.
Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998) (internal
quotation marks omitted).  These circumstances include, but are
not limited to (a) the frequency of the discriminatory conduct,
(b) whether it is physically threatening or humiliating, or a
mere offensive utterance, and (c) whether it unreasonably
interferes with an employee's work performance, but none of these
single factors is required. <u>Harris v. Forklift Sys., Inc.</u>, 510
U.S. 17, 23 (1993).  Given the fact-intensive nature of this

12

inquiry, whether a plaintiff's particular working conditions rose to the level of a hostile environment can be resolved on summary judgment in appropriate cases, but is an inquiry "often reserved for a fact finder," <u>Pomales v. Celulares Telefonica, Inc.</u>, 447 F.3d 79, 83 (1st Cir. 2006), as New England Finish acknowledges.

L'Etoile testified that, from the beginning of her tenure with New England Finish, both of her foremen, Pomerleau and Hallee, repeatedly indicated that they did not want women on the job.  Both men expressed this sentiment by cursing women in front of L'Etoile and demeaning their abilities, comments that were directed specifically at L'Etoile on more than one occasion. There is no question that remarks of this nature can support a hostile environment claim.  <u>See</u> <u>Lipsett v. Univ. of P.R.</u>, 864 F.2d 881, 905 (1st Cir. 1988) (ruling that female doctors' suffering a "constant verbal attack, one which challenged their capacity as women to be surgeons . . . could be found to have contributed significantly to the hostile environment"); <u>see also</u>, <u>e.g.</u>, <u>Boumehdi v. Plastag Holdings, LLC</u>, 489 F.3d 781, 788 (7th Cir. 2007) (overturning summary judgment for employer on hostile environment claim "[a]lthough most of [the] alleged comments were sexist rather than sexual," including supervisor's remarks that women did not belong on the job).

New England Finish attempts to minimize the significance of these comments, arguing that L'Etoile has not identified enough "specific statements" to survive summary judgment on her hostile environment claim.  To be sure, "conclusory allegations" do not suffice to defeat summary judgment, <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990), but L'Etoile came forward with a good deal more than that in her deposition testimony.[11]  She testified, for example, that Pomerleau made his French-language "Goddamned women!" comments "often."  Although she identified only two specific instances, the court cannot, in deciding New England Finish's motion for summary judgment, construe that testimony to mean that those were the only two times Pomerleau ever did that.  <u>See</u> <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 50 (1st Cir. 2008) (relying on plaintiff's testimony that harassing conduct "happened a lot" in reversing summary judgment against her on hostile environment claim).

Furthermore, L'Etoile also testified to a number of comments from Hallee, and all of the complained-of remarks occurred in a

---

[11]   In a like vein, New England Finish suggests that L'Etoile's testimony alone is inadequate, arguing that she "has been unable to produce a single witness" to corroborate these allegations.  But this court is not aware of any authority, either with regard to hostile environment claims specifically or in a broader context, requiring a plaintiff to provide her own testimony to survive summary judgment.

context where she was told, by both Houle and Pomerleau, that she was there only because New England Finish was required to have a woman working on certain jobs.  In any event, "there is no magic number of incidents required to establish a hostile environment claim."  <u>Boumehdi</u>, 489 F.3d at 789.  When the evidence is examined in the light most favorable to L'Etoile, the defendants are not entitled to summary judgment on this claim.

### C.   **L'Etoile's Discrimination Claim**

New England Finish argues that L'Etoile cannot make out a prima facie case of sex discrimination in any of her lay-offs, and that, even if she can, she cannot rebut the company's proffered legitimate, nondiscriminatory reasons for those layoffs.  Given the ruling that the statute of limitations bars L'Etoile's claims arising out of her layoffs of August 15, 2003, and earlier, the court will consider this argument only as to the layoffs of December 8, 2003 and April 14, 2004--the latter of which effectively served as a termination.[12]

---

[12]  The court acknowledges that New England Finish disputes this characterization, arguing that the decision to lay off L'Etoile on April 14, 2004, was just that; it was not until later that the company decided not to re-hire her again.  But the evidence, when taken in the light most favorable to L'Etoile, suggests that she was effectively terminated on April 14, 2004, which, in any event, New England Finish has admitted in its answer.  So the court will interchangeably refer to the April 14, 2004, action as a layoff or a termination.

15

To establish a prima facie case of a discriminatory layoff, an employee must show "that he or she (1) was a member of a protected class, (2) met the employer's legitimate job-performance expectations, (3) was laid off, and (4) that the employer either did not treat members of the protected class neutrally or retained persons not within the protected class in the same position." Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995); see also, e.g., Currier v. United Techs. Corp., 393 F.3d 246, 254 (1st Cir. 2004).  If the employee succeeds in making this showing, which is "not onerous," the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for laying off the plaintiff.  Cruz-Ramos v. P.R. Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993)).  If the employer succeeds in making that showing, the burden shifts back to the employee to show "(1) that the employer's articulated reason for laying off the plaintiff is a pretext and (2) that the true reason is discriminatory." Udo, 54 F.3d at 13.

New England Finish argues that L'Etoile cannot show a prima facie case of discrimination because "the possibility . . . exist[s] that she was laid off due to problems with her performance."  But the mere "possibility" that an employee did not meet his or her employer's legitimate expectations does not

16

entitle the employer to summary judgment on a discrimination claim, provided the employee adduces "minimally sufficient evidence" to the contrary.  <u>Vega v. Kodak Caribbean, Ltd.</u>, 3 F.3d 476, 479 (1st Cir. 1993).  Here, L'Etoile has shown that, despite New England Finish's stated concerns about her performance, those were (with one exception) never previously voiced to her and, indeed, the company kept rehiring her after laying her off.  This evidence suffices to establish a prima facie case that she was qualified to work as a taper.  <u>See</u> <u>Currier</u>, 393 F.3d at 248-54 (ruling that employee with "record of proven success" made out prima facie case of qualifications, despite negative reviews); <u>Brennan v. GTE Gov't Sys. Corp.</u>, 150 F.3d 21, 27 (1st Cir. 1998) (ruling that employee had shown prima facie case of qualifications where he "received acceptable rankings in virtually every appraisal" in his previous reviews); <u>Woodman v. Haemonetics Corp.</u>, 51 F.3d 1087, 1092 (1st Cir. 1995) (similar).

L'Etoile concedes that New England Finish has met its burden of articulating a legitimate, non-discriminatory reason for the layoffs, i.e., that she was less valuable as an employee, in terms of both her productivity and her flexibility, than her co-workers who remained.  In attempting to expose this as pretext, L'Etoile disputes each of the particular shortcomings proffered by the company, emphasizing again that she had essentially never

been criticized for her work in the past.  Evidence that an
employer has never previously voiced its stated concerns over an
employee's performance may suggest that those concerns are
pretextual.  See Hidalgo v. Overseas Condado Ins. Agencies, Inc.,
120 F.3d 328, 336-37 (1st Cir. 1997); Mulero-Rodriguez v. Ponte,
Inc., 98 F.3d 670, 675 (1st Cir. 1996); Hebert v. Mohawk Rubber
Co., 872 F.2d 1104, 1115-16 (1st Cir. 1989).

L'Etoile also relies on the sexist comments allegedly
uttered by her foremen, Hallee and Pomerleau; such "[s]tatements
by a supervisor carrying the inference that the supervisor
harbored animus against protected classes of people or conduct
are clearly probative of pretext." Hodgens v. Gen. Dynamics
Corp., 144 F.3d 151, 171 (1st Cir. 1998).  Finally, L'Etoile
points to evidence that, on both December 8, 2003 and April 14,
2004, she was laid off as New England Finish completed work on a
job for which it was required to employ a woman, in keeping with
the remarks by both Pomerleau and Houle that she would be
assigned only to such jobs.[13]  These kinds of remarks can also
show discriminatory animus.  See, e.g., Billings, 515 F.3d at 56-
57 (relying on employer's comments linking its actions to

---

[13]  There is also the fact that, when New England Finish
laid off L'Etoile in both December 2003 and April 2004, it was
actually increasing the number of tapers in its employ on a
company-wide basis.

employee's pending discrimination lawsuit in reversing summary judgment for employer on retaliation claim).

L'Etoile's evidence, taken as a whole, suffices to create a genuine issue as to whether New England Finish's justifications for laying her off on the dates in question are pretextual and whether, in fact, the true reason for those layoffs was discriminatory animus.  While this evidence is not overwhelming by any means, "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts should be particularly cautious about granting summary judgment."  <u>Hodgens</u>, 144 F.3d at 167.  In an exercise of that caution, this court denies New England Finish's motion for summary judgment on the discrimination claims.


D.   <u>**L'Etoile's Retaliation Claim**</u>

The burden-shifting framework used to resolve employment discrimination claims under Title VII is also used to resolve retaliation claims.  <u>See</u> <u>Hodgens</u>, 144 F.3d at 160.  To make out a prima facie case of retaliation, an employee must show (1) he or she engaged in a protected activity, (2) he or she suffered a materially adverse action, and (3) a causal connection between the protected activity and the adverse action.  <u>See</u>, <u>e.g.</u>,

<u>Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff</u>, 511
F.3d 216, 223 (1st Cir. 2007).  If the employee carries this
"relatively light burden," <u>id.</u> at 224, the burden shifts to the
employer to articulate a legitimate, non-discriminatory reason
for the adverse action.  <u>See</u>, <u>e.g.</u>, <u>Billings</u>, 515 F.3d at 55.
"If the employer's evidence creates a genuine issue of fact, the
presumption of discrimination drops from the case, and the
plaintiff retains the ultimate burden of showing that the
employer's stated reason for terminating him was in fact a
pretext for retaliating against him."  <u>Hodgens</u>, 144 F.3d at 161.

In moving for summary judgment on L'Etoile's retaliation
claim, New England Finish argues that she cannot show a causal
connection between her protected conduct--confronting Pomerleau
with the <u>Technical Assistance Guide</u> in late March 2004--and her
subsequent termination, either for purposes of her prima facie
case or to rebut the company's proffered non-discriminatory
reasons for firing her.  But, as L'Etoile notes, the "temporal
proximity" between when she confronted L'Etoile and when she was
laid off, which was less than three weeks, itself suffices to
demonstrate a prima facie case of retaliation.  <u>Mariani-Colon</u>,
511 F.3d at 224.

New England Finish challenges this conclusion,[14] pointing out that "to draw such an inference, there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." Pomales, 447 F.3d at 85.  This argument is premised on the view that, because Pomerleau did not tell Houle about the confrontation with L'Etoile until long after the firing, that protected conduct could not have figured into Houle's decision to terminate her.

But, while it is undisputed that Houle had the ultimate authority to hire and fire employees, he gave testimony that, when taken in the light most favorable to L'Etoile, suggests that Pomerleau participated in the decision to lay her off on April 14, 2004.[15]  This evidence creates a genuine issue of fact as to whether the "decisionmaker" on L'Etoile's final layoff was indeed

---

[14]  New England Finish also argues that "three weeks is an inordinately long time in an industry where people are laid off on a daily basis."  While this argument may have some merit, it is undercut by the fact that the company was actually increasing its number of tapers at that point, see note 13, supra, as well as by the ambiguity in the record--which must be construed in L'Etoile's favor--as to how long passed between her confronting Pomerleau and his complaining to Houle, as opposed to when the layoff actually occurred.  At this stage, it cannot negate L'Etoile's temporal proximity theory.

[15]  Specifically, Houle testified, in reference to this decision, that he and Pomerleau "both came to an agreement that work had slowed down and that she was the next one," in keeping with the company's practice of making layoff decisions in "[c]ombination" between the two men.

unaware of her protected conduct.  See Pomales, 447 F.3d at 85
(ruling that employee could not establish retaliation where
decisionmaker lacked knowledge of protected conduct and there was
"no proof" that those at the company who did "participated [in]
or otherwise influenced" the decision); Santiago-Ramos v.
Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000)
(reversing summary judgment for employer on discrimination claim
based in part on sexist comments by subordinate who "was in a
position to influence . . . the key decisionmaker").

     As just discussed in the analysis of L'Etoile's
discrimination claim, which also arises, in part, out of the
April 14, 2004, termination, she has come forward with sufficient
evidence to create a genuine issue as to whether the company's
stated reasons for firing her were pretexts for unlawful
retaliation.  In the case of her retaliation claim, however,
there is also the fact that, in its answer to L'Etoile's amended
complaint, New England Finish gave an entirely different reason
for terminating her, i.e., that she had failed to complete
mandatory safety training.  But Pomerleau and Houle attempted to
retreat from this rationale at their depositions, as discussed
supra.  These kinds of shifting explanations for an employer's
challenged action can demonstrate pretext.  See, e.g., Billings,
515 F.3d at 56.  Based on this and the other evidence already

surveyed, New England Finish's motion for summary judgment on L'Etoile's retaliation claim is denied.

## IV.   Conclusion

For the foregoing reasons, New England Finish's motion for summary judgment (document no. 23) is granted as to L'Etoile's discrimination claim, insofar as it arises out of the layoffs of March 4, 2002, June 24, 2002, January 1, 2003, and August 15, 2003, but is otherwise denied.  New England Finish's motion to strike (document no. 28) is denied as moot.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 29, 2008

cc:  Heather M. Burns, Esq.
     Charla B. Stevens, Esq.